UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 22-CR-20557-BB(s)

UNITED STATES OF AMERICA

v.

JAVIER HERNANDEZ and
RAMON REYES ARANDA,

      **Defendants.**
_____/

## UNITED STATES' RESPONSE TO DEFENDANT JAVIER HERNANDEZ'S MOTION TO SUPPRESS

Defendant Javier Hernandez's ("the defendant" or "Hernandez") Motion to Suppress evidence seized from his cellphone (DE 102) should be denied because 1) the Fourth Amendment does not apply to foreign law enforcement officials; 2) Hernandez's cellphone was searched pursuant to a lawful search warrant; and 3) the cellphone data is reliable and therefore admissible.

**I.    FACTUAL BACKGROUND**

    **a.  Summary of Offense Conduct**

Between December 2017 and October 2019, defendant Hernandez actively participated in a criminal organization that smuggled Cuban migrants into the United States by way of Mexico via boat. Other members of this criminal organization, which include Jose Miguel Gonzalez Vidal and unindicted coconspirator Mario Alberto Enrique Lopez, would then hold the migrants at various houses in Mexico while awaiting payment for the smuggling services from the migrants' families. A key facet of the organization's criminal scheme involved the use of stolen vessels to 1) transport the migrants and 2) bribe Mexican officials to permit the organization to conduct its activities undetected. The organization would strip the stolen vessels of identifying characteristics,

purchase falsified identification documents to legitimize the stolen vessels, and sell the stolen vessels using fraudulent titles to other individuals.

Defendant Hernandez participated in the organization by procuring stolen boats and transporting them from Florida to Mexico. Defendant Reyes Aranda would identify the target vessels and communicate with defendant Hernandez about them. The defendants would obtain counterfeit documentation for the vessels and boat parts. Defendant Hernandez would transport the vessels to a marina in Mexico, owned by Enrique Lopez, for use by other members of the organization. Defendants Hernandez and Reyes Aranda were paid by other members of the organization for procuring the stolen vessels.

Evidence obtained from Hernandez's cellphone included multiple conversations between Hernandez and other members of the conspiracy discussing their illicit activities. For example, between March and July 2019, Hernandez and Reyes Aranda exchanged messages discussing payments, fuel tanks, the weather on the route from Naples to Mexico, and photographs of stolen vessels, among other topics. The cellphone also contained messages with a prospective Cuban migrant, where Hernandez bragged about the organization's ability to bribe Mexican law enforcement officials with stolen cars and other items. In one message, Hernandez told the Cuban migrant that, in October 2019, he would be transporting a car to Mexico as a bribe for a police chief, which he hoped would coax the chief to "loosen the reins." Once loosened, Hernandez explained that he would be able to procure "papers" for the migrant.

For their actions, the defendants are charged in a superseding indictment with one count of conspiracy to encourage aliens to enter the United States for financial gain, in violation of Title 8, United States Code, Section 1324(a)(1)(A)(v)(I) (Count 1); conspiracy to transport stolen vessels, in violation of Title 18, United States Code, Section 371 (Count 2); conspiracy to traffic in certain

motor vehicles with tampered or altered identification numbers, in violation of Title 18, United States Code, Section 371 (Count 3); trafficking in certain motor vehicles, in violation of Title 18, United States Code, Section 2321 (Count 4); and money laundering conspiracy, in violation of Title 18, United States Code, Section 1956(h) (Count 5) (DE 51).[1]

### b. November 2019 Theft and Transportation of "Luca Brasi"

For example, on November 20, 2019, Hernandez transported a stolen 2007 28' Southport center console vessel, a/k/a "Luca Brasi" from Naples to Mexico. This stolen vessel is emblematic of the organization's scheme. Text message conversations between Hernandez and Reyes Aranda demonstrate that Reyes Aranda identified the vessel, setting Hernandez up to be able to transport it from Florida to Mexico without the owner's permission or authority. On October 25, 2019, approximately one month before the theft, Reyes Aranda sent Hernandez several photographs of the Luca Brasi vessel, which appear to have been taken under the cover of darkness, suggesting Reyes' intent to conceal his activities. The defendants also discussed procuring an engine key for the model of the engines installed in the Luca Brasi. Law enforcement recovered photographs of this same vessel on Hernandez's cellphone, which metadata shows were taken during Hernandez's journey to Mexico.

On November 21, 2019, Mexican law enforcement arrested Hernandez for unrelated criminal activity. During his encounter with Mexican law enforcement, Hernandez admitted to traveling to Mexico aboard a green vessel that he had given to Enrique Lopez. That evening, Mexican law enforcement conducted surveillance of Enrique Lopez's marina, where Hernandez said he had left the vessel, and observed a blue truck leaving the dock with a trailer carrying a green boat. Enrique Lopez was driving the truck and was unable to provide documentation

---

[1] Defendant Reyes Aranda is only charged in Counts 2 and 5 of the superseding indictment.

establishing his ownership of the green boat. Notably, the boat had already been altered in several ways, including: (1) the green color had been stripped for repainting; (2) despite the paint stripping, a faint outline of the word "Southport" was visible; and (3) the engine serial number sticker had been removed. These alterations are consistent with the organization's attempts to conceal the stolen vessels.

### c. Seizure of Hernandez's Phone

Mexican law enforcement officers seized Hernandez's phone during their encounter with him on November 21, 2019. The officers who seized the phone secured it. Mexican law enforcement was aware of the Federal Bureau of Investigation's ("FBI") investigation into the alien smuggling ring, so they notified the agency of Hernandez's arrest and recovery of his cellphone. Based on Hernandez's admission that he drove a boat to Enrique Lopez's marina, Mexican law enforcement believed there to be a connection between Hernandez and the alien smuggling ring. FBI agents traveled to Mexico to retrieve the cellphone on or about December 10, 2022.[2]

Prior to providing the cellphone to the FBI, Mexican law enforcement conducted a limited extraction of the cellphone that included images of WhatsApp chat threads. As acknowledged in Mr. Pullen's expert report,[3] the cellphone was placed in airplane mode when these photographs were taken (DE 102-1 at 17), vitiating any argument that scrolling of the device somehow altered the information on it. FBI agents returned the cellphone to the United States, where it was stored at a secure location pending the acquisition of a search warrant. Chain of custody from the time

---

[2] Hernandez's Motion to Suppress states that FBI agents traveled to pick up the phone on November 24, 2019 (DE 102 at 1). This is incorrect. Agents did not travel to Mexico until December 10, 2022.

[3] References to Mr. Pullen's expert report will be cited as DE 102-1.

4

that FBI took possession of the phone is properly documented in accordance with the agency's policies and procedures.[4]

On February 26, 2020, the Honorable Edwin G. Torres authorized a search warrant for the cellphone's contents. Notably, Hernandez's motion does not challenge the probable cause to search the cellphone's contents, but rather focuses on the actions of Mexican law enforcement officers and the reliability of the evidence subsequently recovered from the cellphone.

### d. The FBI's Search of the Cellphone

On or about February 27, 2020, FBI agents executed the search warrant by performing a forensic extraction of the cellphone.

On or about March 2, 2020, upon realizing that the WhatsApp data was not contained within the February 27 extraction,[5] FBI agents took photographs of the cellphone's WhatsApp chats and additional items on the phone that were not captured on the extraction. These photographs were also taken while the device was still in airplane mode. FBI agents knew of the existence of the WhatsApp chats based on the information provided by Mexican law enforcement.

In September 2020, agents powered on the cellphone to take additional photographs of the WhatsApp messages.

---

[4] Hernandez states that "there does not appear to be proper chain-of-custody evidence supporting the integrity of the Phone's contents after its seizure," and asks this Court to conclude that the lack of chain of custody documentation from Mexican law enforcement means that the evidence on the phone was not properly preserved (DE 102 at 3). This is simply a stretch too far. Mexican law enforcement's chain of custody documentation procedures, or lack thereof, do not render the cellphone evidence unreliable particularly when, as explained below, Mexican law enforcement officials are not even subject to the requirements of the Fourth Amendment. It cannot be so, then, that they are suddenly subject to certain chain of custody documentation procedures, particularly when there is a wide range of documentation procedures even among American law enforcement agencies.

[5] The software available to the agents at the time of the extraction was not capable of extracting WhatsApp data from a device.

On or about October 2020, the FBI Miami Field Office received a license to use the Cellebrite Premium software. This software, which the Miami Field Office did not have at the time of the initial extraction, permitted the download of WhatsApp data from the device. On or about April 7, 2021, a second extraction was performed by the FBI's Computer Analysis Response Team ("CART") using the Cellebrite Premium software. This extraction captured the WhatsApp data, much of which was already in law enforcement's possession as a result of the photographs taken in September 2020 and the information provided by Mexican law enforcement.

### e. Allegations of Evidence Tampering

Hernandez claims that law enforcement officials engaged in a series of actions that deleted and/or altered the data on the cellphone, rendering it unreliable.

First, Hernandez claims that evidence on the phone was deleted and rendered irrecoverable due to law enforcement's actions. Yet Hernandez fails to point to any evidence, whether from the extraction or otherwise, indicating 1) when the items were deleted; 2) whether the deletion occurred before or after law enforcement's seizure; and 3) how he can attribute these deletions to law enforcement. Hernandez also fails to acknowledge the very real possibility that the cellphone extraction's reference to deleted items are items that *he* deleted. Finally, the purported deletion of evidence from the phone does not render the evidence that *was* on the phone unreliable.

Next, Hernandez alleges that evidence on the phone changed while in law enforcement custody because the phone was either not placed in airplane mode or taken in and out of airplane mode (DE 102 at 3). Hernandez points to two pieces of evidence supporting this proposition: 1) a phone call received from Reyes Aranda on November 23, 2019; and 2) 190 items that "appeared on the phone after it was in police custody." (DE 102-1 at 18).

As to the November 23, 2019 phone call, Hernandez asks this Court to conclude that the phone call indicates law enforcement placed the phone in airplane mode and then placed it back onto the network. Hernandez reaches this conclusion because photographs from Mexican law enforcement show that the phone was, in fact, placed in airplane mode. Critically, the dates that Mexican law enforcement took those photographs are not documented. So it is equally if not more likely that the phone was placed in airplane mode at some time after the incoming call from Reyes Aranda. In any event, the government does not intend to use evidence of that November 23, 2019 phone call at trial. This phone call does not render the years' worth of incriminating messages and other evidence on the phone unreliable.

Hernandez also claims that 190 new items appeared on the phone because law enforcement reconnected the phone to the network (DE 102-1 at 18). Hernandez presumes that the only way these items could have ended up on the phone is if law enforcement reconnected the device to the network, but this is not the case. As described above, law enforcement powered the phone off and on to take photographs in September 2020 and March 2021. The new items that Hernandez claims invalidate the remainder of the phone evidence include calendar entries, temporary cache files, and website cookies. Each of these data files could have been generated because of the phone being powered on and off. For example, the new calendar entries on the cellphone related to recurring national holidays. Many phones' default settings reflect these recurring holidays, meaning that the phone was likely preprogrammed to populate these items as they occurred. The same is true as to the cookie files and temporary cache files. These items can be altered by the device when photographs are opened and closed, or when applications are running in the background. For example, one of the cookie files related to the Amazon application. If the Amazon application was open on the device as law enforcement examined it, the cookie file could be deleted if it was past

a set expiry date. As to the photographs, temporary cache files are created on a cellphone when an item is opened and closed, not necessarily when it is connected to the network. In sum, Hernandez concludes that law enforcement altered the evidence on his phone and must have connected it to the network, but this conclusion ignores that the "new items" on the phone could have been generated as a result of powering the phone on and off, actions conducted by the operating system while the device is powered on, which Hernandez acknowledges is permissible under accepted forensic practices (DE 102-1 at 3) (discussing why one would either leave a device powered on or turn it off after seizure). Again, the government does not intend to introduce this "new" evidence at trial. And there is no evidence that these "new items" somehow mean that the evidence the government intends to introduce has somehow been altered or is otherwise unreliable.

Finally, Hernandez states that the phone was manually browsed, which changed the data on the phone (DE 102 at 3). But he fails to acknowledge, again, that the manual browsing of the device took place *while* the phone was in airplane mode. Taking photographs of a cellphone's contents while the phone has been taken off the network cannot be said to cause the alteration of data on the device, aside from the operating system functions that run on a live device. To the extent that Hernandez intends to allege that *screenshots* were taken instead of photographs, and that they were taken while the phone was on the network, the government is unaware of any evidence supporting such a claim.

Hernandez's motion to suppress should be denied because Mexican law enforcement officials are not subject to the Fourth Amendment's requirements and because the cellphone data is reliable.

## II.   ARGUMENT

### a. Mexican Law Enforcement are not Subject to the Requirements of the Fourth Amendment.

The evidence on Hernandez's cellphone should not be suppressed as the result of any actions by Mexican law enforcement because the Fourth Amendment governs searches performed by U.S. government officials, not private parties or foreign governments. It is well-established that the Fourth Amendment does not apply to actions carried out by foreign officials in their own countries enforcing their own laws, even if American officials are present and cooperate to some degree. *United States v. Odoni*, 782 F.3d 1226, 1238 (11th Cir. 2015); *United States v. Emmanuel*, 565 F.3d 1324 (11th Cir. 2009) ("The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the foreign country.") (internal citations omitted); *United States v. Behety*, 32 F.3d 503 (11th Cir. 1994) (same); *United States v. Rosenthal*, 793 F.2d 1214, 1231 (11th Cir. 1986) ("Fourth Amendment rights are generally inapplicable to an action by a foreign sovereign in its own territory in enforcing its own laws, even though American officials are present and cooperate in some degree").

And for good reason—the Fourth Amendment is intended to protect against unreasonable searches and seizures, and the exclusion of evidence is a "last resort" aimed at curbing police conduct that is "sufficiently deliberate [such] that exclusion can meaningfully deter it and sufficiently culpable that such deterrence is worth the price paid by the justice system." *United States v. Brooks*, 648 F. App'x 791, 794 (11th Cir. 2016) (internal quotations omitted). Here, Hernandez was arrested for violating Mexican laws, and Mexican law enforcement seized the phone pursuant to their laws. Applying the requirements of the Fourth Amendment to foreign

9

officials would have no deterrent effect whatsoever, rendering the exclusionary rule's purpose moot.

Courts will not exclude evidence obtained by foreign police officials, even if the search did not comply with the Fourth Amendment, unless 1) the conduct of the foreign officials shocks the judicial conscience, or 2) the foreign officials conducting the search were actually acting as agents for their American counterparts. *Rosenthal*, 793 F.2d at 1231. The mere fact that American law enforcement agents were present during a search is insufficient to invoke the latter exception. *Behety,* 32 F.3d at 510.

Here, the defendant does not allege, nor is there any evidence to suggest, that Mexican law enforcement acted in a manner that shocks the conscience or that they performed any actions at the directions of American law enforcement. Absent a showing of either circumstance, the defendant's motion to suppress evidence based on the actions taken by Mexican law enforcement woefully fails. Nor do Hernandez's arguments as to the reliability of the cellphone evidence entitle him to the requested relief.

### b. Defendant's Allegations Surrounding New Evidence on the Cellphone Are Unfounded and, Even if True, Do Not Provide a Basis for Suppression.

The remainder of Hernandez's arguments bear only on the reliability and authenticity of the evidence obtained from the cellphone. Even assuming that Mexican law enforcement engaged in actions that are inconsistent with American practices for preserving electronic evidence, these actions cannot be attributed to American law enforcement officials and cannot form the basis for exclusion of the cellphone evidence. These arguments are also irrelevant to the suppression analysis the Court must undertake.[6]

---

[6] American law enforcement obtained a search warrant for the cellphone's contents. A defendant initially bears the burden of proving that suppression is proper. *See Batten v. United States*, 188

Motions to suppress "must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a substantial claim is presented . . . . A court need not act upon general or conclusory assertions. . . ." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir.1985) (citations omitted). Additionally, "[i]t is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir.1977).[7]

As an initial matter, Hernandez's motion relies on speculative and conjectural conclusions in support of his requested relief. His assertion that law enforcement's actions altered the cellphone's data does not make it so. *See, e.g.*, DE 102-1 at 22 (". . .what other changes were made to the phone? Were any files deleted by the Mexican authorities, either purposefully or inadvertently? **It is difficult to know exactly what changes were made to it**, but it is certain that the phone was substantially altered. . .") (emphasis added). But even if these specious allegations were true, these issues bear on the weight of the evidence, not its admissibility, and not whether law enforcement violated Hernandez's rights under the Fourth Amendment.

The defendant's motion, while styled as a motion to suppress, actually challenges the reliability and authenticity of evidence to be presented at trial, as required by Fed. R. Evid. 901. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it

---

F.2d 75, 77 (5th Cir. 1951) ("[the] burden is on a defendant who seeks to suppress evidence obtained under a regularly issued search warrant to show the want of probable cause"). Here, Hernandez fails to articulate any attack on the warrant authorizing the cellphone search, the probable cause supporting the warrant, or the circumstances surrounding its execution. His motion must therefore be denied, as the remainder of his arguments bear only on the reliability of the evidence and not on whether law enforcement violated Hernandez's Fourth Amendment rights.

[7] Pursuant to *Bonner v. Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981), opinions of the Fifth Circuit issued prior to October 1, 1981, are binding precedent in the Eleventh Circuit.

11

is." Fed. R. Evid. 901(a). In essence, Hernandez claims that the government will be unable to show that the cellphone is in the "same or substantially the same condition" as when it was seized from him because of either deletion of data or additions of new data to the device.

Gaps in chain of custody "affect only the weight of the evidence and not its admissibility." *United States v. Ramirez*, 491 F. App'x 65, 73 (11th Cir. 2012). In *Ramirez,* the Eleventh Circuit found that the district court did not abuse its discretion in admitting lab reports despite defendant's argument of a "total breakdown in the chain of custody." *Id.* (citing *United States v. Roberson*, 897 F.2d 1092, 1096 (11th Cir. 1990) (acknowledging that gaps in chain of custody go to weight, not admissibility of evidence)); *See also United States v. Hughes*, 840 F.3d 1368, 1383 (11th Cir. 2016) (same). This is true even where certain data has been deleted off a cellphone. For example, in *United States v. Moore*, 71 F.4th 678, 687 (8th Cir. 2023), the Eighth Circuit found that the district court did not abuse its discretion in admitting text messages from a cellphone, even where a detective took the cellphone out of evidence and guessed so many passwords to unlock the phone that the cellphone eventually reset and sent an email with a passcode to the cellphone owner's email address. *Id.* at 682. The cellphone reset caused its call history and many applications to be deleted. *Id.* Eventually, law enforcement conducted a forensic extraction of the device after the reset and were able to obtain limited data. *Id.* The defendant argued that the district court should exclude the cellphone evidence because the cellphone was not in "substantially the same condition" as when police seized it due to the reset. *Id.* at 685. The district court found that the defendant's arguments went to the weight and not the admissibility of the evidence and reasoned that there was "a reasonable probability that the information retrieved was substantially in the same state as when it was found. . ." *Id.* The same is true here. Hernandez's claims that items were

12

deleted from the cellphone, particularly when he cannot demonstrate that law enforcement caused the deletion, does not affect the admissibility of the evidence.

This is also the case even if the phone was not immediately placed in airplane mode. First, it is well-established that the government need take only reasonable precautions to preserve evidence. There is no legal requirement that mandates law enforcement officials to take a cellphone off the network immediately upon recovery. And at least one court has held that, even where a cellphone was kept on the network and there was evidence of calls and/or text messages received by a cellphone when it was in law enforcement custody, it did not render the evidence on the cellphone unreliable and/or inadmissible. *See, e.g.*, *United States v. Stewart*, 2022 WL 1295321, at *16 (N.D. Fla. Feb. 14, 2022), *report and recommendation adopted*, 2022 WL 1289262 (N.D. Fla. Apr. 29, 2022).

In *Stewart*, the defendant argued that his attorney was ineffective for failing to appeal the district judge's denial of his motion to suppress which was based, in part, on allegations that the data on the cellphone had been changed while in law enforcement custody because the device remained on a cellular network for some time after seizure. The district court reviewing Stewart's ineffective assistance of counsel claim explained that the defendant failed to cite any caselaw, and the court had found none, that would support Stewart's position that the cellphone was inadmissible. *Id.* When addressing the motion to suppress itself, the district court judge presiding over the criminal case reasoned that, "given the nature of technology, if an item had to be in exactly, rather than substantially, the same condition at the time of the seizure, no phone or computer would ever be admissible in any court." *Id.* (citing 14-CR-25-TKW (N.D. Fla.) (DE 164 at 163)). Moreover, there was no evidence that the phone was altered in any material respect that would have precluded its admissibility or that there was a chain of custody violation. *Id.* So too

13

here. Any indication that the phone received new data after seizure does not materially alter the evidence that was found on the phone. And again, the government does not seek to introduce any of the cellphone evidence that is dated after Hernandez's arrest at trial.

The only case cited by the defendant in support of his motion is *United States v. Garcia*, 718 F.2d 1528, 1534 (11th Cir. 1983), which addresses the predicate for admitting physical exhibits into evidence. Defense's invocation of *Garcia* supports the government's position that the defendant's motion to suppress is, in fact, an attack on the authenticity and reliability of the evidence. While the defendant is correct that *Garcia* lists a series of factors the Court may consider in determining whether an admitting party has laid the proper foundation for introduction of physical evidence, he leaves out the Eleventh Circuit's critical invocation of *Brewer v. United States*, 353 F.2d 260, 262 (8th Cir. 1965), which provides that "in the absence of any evidence to the contrary, the trial judge is entitled to assume that an official would not tamper with the exhibits." 353 F.2d at 262 (quoting *Gallego v. United States*, 276 F.2d 914, 917 (9th Cir. 1960)). Hernandez will be unable to demonstrate that any official tampered with his cellphone, nor has he raised any claims that exculpatory evidence was deleted or that law enforcement fabricated the messages that were recovered from the device.

In sum, even if Hernandez is correct about the deleted and/or changed data on the cellphone, such information does not entitle him to suppression or exclusion of the evidence. While Hernandez is free to argue to the jury that the plethora of text messages implicating him in the charged conspiracies are somehow unreliable fabrications or additions by Mexican and American law enforcement, such claims do not entitle him to the requested relief, and his motion should be denied.

### III. CONCLUSION

Wherefore, the United States respectfully requests that the Court deny Hernandez's motion to suppress the evidence seized from his cellphone.

Respectfully submitted,

MARKENZY LAPOINTE
UNITED STATES ATTORNEY

By: _____
Arielle Klepach
Assistant United States Attorney
Court ID No. A5502706
Arielle.Klepach@usdoj.gov
United States Attorney's Office
99 Northeast 4th Street
Miami, Florida 33132-2111
Tel: (305) 961-9272
Arielle.Klepach@usdoj.gov

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was filed with the Court and delivered to counsel of record using CM/ECF on September 11, 2023.

*/s/Arielle F. Klepach*
Arielle F. Klepach
Assistant United States Attorney