UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 22-20557-CR-BB

UNITED STATES OF AMERICA,
    Plaintiff,

vs.

JAVIER HERNANDEZ,    )
    Defendant.    )
_____)

**DEFENDANT HERNANDEZ'S REPLY TO GOVERNMENT'S
RESPONSE TO MOTION TO SUPPRESS CELL PHONE EVIDENCE**

Defendant Javier Hernandez ("Hernandez"), by and through undersigned court-appointed counsel, replies to Plaintiff United States of America's ("Government") Response ("Response") [ECF No. 122] to his Motion to Suppress Cell Phone Evidence [ECF No. 102], and states:

1. The Government lists three reasons which it believes justify the denial of his Motion to Suppress ("MTS").

2. Those four reasons are: 1) the Fourth Amendment does not apply to Mexican law enforcement officials ("LEOs"); 2) his cell phone was searched pursuant to a lawful search warrant; and 3) the cell phone data is reliable and therefore admissible.

3. As a threshold matter, it should be highlighted that the Response is not supported by any opinions or analysis from any of the Government digital forensic experts, and there are five of them. Because what an attorney says is not evidence, the Court should not assign much, if any, to the arguments the Government advances to oppose the MTS.

4. On the other hand, Hernandez has provide the Court and the Government with the August 25, 2023 report that expert Thomas Pullen issued setting forth his detailed forensic

1

analysis and related opinions.

5. The Government recounts that Mexican LEOs seized the phone during an "encounter with Hernandez on November 21, 2019." At the time, according to the Government's own admissions, these Mexican LEOS were aware the Federal Bureau of Investigation ("FBI") was conducting an investigation of alien smuggling. Yet, those foreign LEOs chose to do things with the phone which Mr. Pullen has opined, in part, that: "the phone was left turned on after seizure, and communicating with the network, which violates one of the canons of mobile forensic work: do not change the evidence from the time of seizure." See Thomas Pullen Report ("TP Report") at p. 16. Mr. Pullen also has stated "there also does not appear to be any documentation of what was done with the phone, but apparently it was browsed by [LEOs] and screen shots taken using the phone itself on November 22 [2019], which violates another rule of mobile forensics: as the FBI's regional computer forensic laboratory put it, 'don't browse. Scrolling through a suspect's mobile phone may alter evidence, and preserving evidence is key.'" TP Report at p. 16.

6. Mr. Pullen states that someone took Hernandez's phone after it had been in police custody for a day, took it out of airplane mode." TP Report at p. 17. Mr. Pullen then gives the opinion, in pertinent part: "taking the phone out of airplane mode destroyed the forensic preservation of the phone, which means [LEOs] connected the phone to the Internet, and thereby changed the information on the phone. New messages came in, which changed the WhatsApp cache, which made messages irrecoverable that may have been otherwise recovered." *Id*.

7. Furthermore, Mr. Pullen states: "there are exactly 190 files that appeared on the phone after it was in police custody. Disturbingly, at least nine of these 190 files are from WhatsApp, because the phone was reconnected to the Internet and received messages while Hernandez was in police custody and thereafter. What's disturbing about that is that, according to Cellebrite,

there were 9,309 text messages found in WhatsApp, and only 18 were recoverable from being deleted." TP Report at p. 18.

8. The Government completely ignores Mr. Pullen's opinion that: "by leaving the phone on, connected to the Internet, and having WhatsApp opened, the message data base changed from the time of seizure, when new messages were written to the database. And in writing new data to the database, any deleted messages present will be overwritten by the SQL cache." TP Report at pp. 18-19. Mr. Pullen opines the cache was altered and messages overwritten while in the custody of the Mexican LEOs. TP Report at 19.

9. On page 20, Mr. Pullen states that on November 22, 2019, sometime after the Mexican LEOs had seized the phone, somebody logged in to PayPal despite the fact that [Hernandez] was under arrest in police custody and his phone was in the possession of the authorities." Mr Pullen provides a screen shot of that post-arrest [Hernandez] police use of the phone. TP Report at p. 20.

10. On page 21, Mr. Pullen opines that while the phone appears to be in airplane mode in the visual he provides in the Report, it must have been taken out of airplane mode and reconnected to the network by the police, because messages were received by the phone for several days *after* the date of the seizure.

11. Also forming part of Mr. Pullen's opinions about the activity on the seized phone, "all of this non-standard forensic procedure is accompanied by a total lack of transparency or documentation about what was done to the phone since being seized. It is certain that the phone evidence is *substantially altered* from its original state, but we can't know everything that was done to it because it was not documented." TP Report at 21.

12. It is very important in replying to the Government's glossing over of the hard facts that Mr. Pullen states on page 22 of the Report,: "it's certain that messages or data that may have been recoverable before seizure may have been rendered irrecoverable by overriding caches, and new data appeared on the phone that did not exist at the time of seizure, but what other changes were made to the phone? Were any files deleted by the Mexican authorities, either purposefully or inadvertently?  It is difficult to know exactly what changes were made to it, *but it is certain that the phone was substantially altered by the non-standard forensic procedures undertaken: messages were made irrecoverable, time stamps were changed, and data was altered.*" Report at p. 22 (emphasis supplied).  Has the Government provided any expert support that the foregoing did not happen?  Not so far.

13. On page 33, Mr. Pullen sets forth a comprehensive account of his conclusions. Among them are that well-established rules of mobile forensics were violated.  The Government reports on the phone extraction using Cellebrite on April 7, 2021 were not the product of a lawful search warrant.  There was no valid search warrant in effect on that date.  The only such search warrant had expired on March 10, 2020.  The unlawful extraction included WhatsApp messages, emails, and Facebook Messenger.  TP Report at pp. 29-33.  These items from the April 7, 2021 search are "fruit of the poisonous tree" and must be suppressed.  *Wong Sun v. United States*, 371 U.S. 471 (1963), and its progeny

14. On page 4, fn 2, of its Response, the Government states that [Hernandez] was wrong when he stated the FBI agents went to pick up his phone on November 24, 2019 (citing MTS at p. 1).  The Government states that date is incorrect because the agents did not travel to Mexico until December 10, 2022.  The search warrant for the Cellebrite extraction was authorized on February 26, 2020 and performed on February 27, 2020.  Hernandez obtained the date of when

the FBI agents traveled to Merida, Mexico to pick up the phone as being November 24, 2019 from an application for a warrant by telephone or other reliable electronic means dated November 17, 2020 signed by the lead FBI agent in this case.  That affidavit describes events that included: a) on November 23, 2019 Mexican LEOS contacted FBI Miami to report they had arrested [Hernandez] for an event.  They notified the FBI that Mexican LEOs had seized Hernandez's cellular telephone in his possession at time of arrest.  Those Mexican LEOs also stated they had conducted surveillance at a co-conspirator's marina, observing him "trailering a boat that matched the description of the one that Hernandez allegedly said he transported from Miami to Mexico.  On November 23, 2019, according to the affidavit, Mexican LEOs approached the person trailering that boat and temporarily detained him.  The affidavit then goes on to state that "on or about November 24, 2019, FBI Miami special agents traveled to Merida, Mexico to collect the telephones "they had seized from Hernandez." Affidavit at pp. 15-17.

15.  In sum, the section of the Response titled "Seizure of Hernandez's phone" (pp. 4-5), rings hollow because it is unsupported by any expert review of the substance of the MTS and TP Report, amounting to nothing more than attorney argument and not evidence for this Court to consider and weigh regarding how to remedy this serious Fourth Amendment violation.

16.  In the next section of its Response, "the FBI Search of the Cell Phone" on or about February 27, 2020, the Government admits what it extracted pursuant to a search warrant did not include WhatsApp data.  The Government also admits it used the phone, rather than kept it in its original state, at different times, including in September 2020, powering on the phone to take additional photographs of WhatsApp messages.  The Government has no expert support in this section of the Response about whether that operation by agents without a warrant impacted adversely the integrity of this cell phone evidence.  The Government's unlawful search of the

phone on April 7, 2021, that much of what was already in law enforcement's possession as a result of the photographs taken in September 2020 and information provided by Mexican LEOs, is not a legal justification for a Fourth Amendment violation.

17. In the next Section of the Response, "Allegations of Evidence Tampering," again, the Government simply uses attorney argument to justify its opposition to the MTS. Those points cannot be relied on by the Court for the same reasons. On page 6 of the Response, the Government says that Hernandez cannot point to any evidence when items were deleted nor whether the deletions occurred before or after LEO seizure. It does not matter when or where the deletions occurred once they were rendered irrecoverable per the TP Report. The point is that the inability to make such determinations are akin to LEOs utilizing a surveillance video and changing its original capture of events to something else. Is the burden for the defendant to prove what has been altered? That would turn the Fourth Amendment on its head, and this Court should not allow that to occur in this case.

18. In the Argument section of the Response, the Government cites the proposition that motions to suppress "must in every critical respect be sufficiently definite, specific, detailed, and non-conjectural to enable the Court to conclude that a substantial claim is presented. A court need not act upon general or conclusory assertions..." Response at p.11 (citing *United States v. Richardson,* 764 F. 2d 1514, 1527 (11th Cir. 1985))(citations omitted). This is curious because the thirty-three (33) page report submitted by Mr. *Pullen is extremely definite, specific, detailed, and non-conjectural*" permitting this Court to reach the conclusion "that a substantial claim" has been presented. All of the arguments the Government makes from beginning to end take the Court on a journey that ignores the unlawful extraction which occurred more than one year after the only search warrant for the phone had expired. That is the sum and substance of why this

Honorable Court must suppress the April 7, 2021 unlawful search of the phone and its fruits of the poisonous tree.

19. The Court should not pay much heed to the Government's claim that Hernandez does not cite to more than *United States v. Garcia*. Those who have practiced in the legal community a long time have learned that when there are not a multitude of cases on a certain legal principle it is because that principle is so well-settled it is not litigated in the lower tribunal, in the intermediate appellate courts, nor the Supreme Court. Here, the Government argues that Hernandez should have trotted out a plethora of cases supporting his position, but when there is no search warrant for a cell phone (unless a border search or some major emergency situation), courts suppress that evidence. Of course, there are no plethora of cases. No rational party on the losing end of that proposition could credibly venture into such appellate territory

20. **Conclusion**: This Honorable Court should not permit the Government to convict Hernandez by presenting evidence to the jury that he has shown, supported by the TP Report, that his phone had been substantially changed, tampered with, altered, deleted, and destroyed. Moreover, any fruits of the April 7, 2021 warrantless search also must be suppressed for an overt and substantial Fourth Amendment violationj.

> Respectfully submitted,
>
> / s / Martin A. Feigenbaum
> Florida Bar No. 705144
> P.O. Box 545960
> Surfside, Florida 33154
> Telephone: (305) 323-4595
> Facsimile:  (844) 274-0821
> Email: innering@aol.com

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was furnished this 13th day of September, 2023 by the CM/ECF system to all parties entitled to electronic notice in this cause in this cause.

/ s / Martin A. Feigenbaum